**No. 24-1672**

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

---

**JANE DOE 1 and JANE DOE 2**,
*Plaintiffs-Appellants,*

**v.**

**META PLATFORMS, INC.**,
*Defendant-Appellee.*

---

On Appeal from the United States District Court
For the Northern District of California
Case No. 4:22-cv-00051
The Honorable Yvonne Gonzalez Rogers

---

**PLAINTIFFS-APPELLANTS'
PETITION FOR REHEARING EN BANC**

---

Ryan D. Andrews
randrews@edelson.com
Roger Perlstadt
rperlstadt@edelson.com
EDELSON PC
350 North LaSalle Street,
14th Floor
Chicago, Illinois 60654
Tel: 312.589.6370

*Counsel for Plaintiffs-Appellants*

# TABLE OF CONTENTS

**Page**

RULE 40(b)(2) STATEMENT ................................................................ 1

INTRODUCTION ................................................................................ 1

STATEMENT OF THE CASE ............................................................... 5

ARGUMENT ....................................................................................... 8

I.   Determining the limits of Section 230's powerful immunity is
     of exceptional importance .......................................................... 8

II.  This Court has unduly broadened Section 230 immunity in
     two critical ways ....................................................................... 9

     A.   Section 230 protects defendants only from traditional
          publisher liability, not traditional distributor liability ........10

     B.   Recommending dangerous third-party content to
          susceptible users is not acting "as the publisher" of that
          content under Section 230 .................................................14

III. This case provides a good vehicle to consider both questions. ......18

CONCLUSION....................................................................................21

CERTIFICATE OF COMPLIANCE ....................................................23

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. TikTok, Inc.,*
116 F.4th 180 (3d Cir. 2024) ....................... 1, 3, 4, 9, 12, 13, 17, 18

*Calise v. Meta Platforms, Inc.,*
103 F.4th 732 (9th Cir. 2024).................................... 3, 9, 10, 11, 13

*Doe v. Grindr Inc.,*
128 F.4th 1148 (9th Cir. 2025)......................................................15

*Doe through Roe v. Snap, Inc.,*
88 F.4th 1069 (5th Cir. 2023)..............................................3, 13, 14

*Doe through Roe v. Snap, Inc.,*
144 S. Ct. 2493 (2024)...................................................................12

*Dyroff v. Ultimate Software Grp., Inc.,*
934 F.3d 1093 (9th Cir. 2019) .......................................... 3, 7, 15, 17

*Fair Hous. Council of San Fernando Valley v. Roommates.Com,*
*LLC,*
521 F.3d 1157 (9th Cir. 2008) ....................................................8, 9

*Force v. Facebook, Inc.,*
934 F.3d 53 (2d Cir. 2019) .......................................................4, 16

*Gonzalez v. Google LLC,*
2 F.4th 871 (9th Cir. 2021), *vacated and remanded,*
598 U.S. 617 (2023)................................................. 3, 4, 13, 14, 15

*Malwarebytes, Inc. v. Enigma Software Grp. USA, LLC,*
141 S. Ct. 13 (2020)...................................... 3, 9, 11, 12, 13, 14, 21

ii

*Moody v. NetChoice, LLC,*
    603 U.S. 707 (2024)...................................................... 1, 4, 17, 18, 20

*Neder v. United States,*
    527 U.S. 1 (1999)...................................................................11

*Stratton Oakmont, Inc. v. Prodigy Servs. Co.,*
    No. 31063/94, 1995 WL 323710 (N.Y. Sup. Ct. May 24,
    1995).................................................................................12

*United States v. Schiff,*
    379 F.3d 621 (9th Cir. 2004) .......................................................20

## Statutes

47 U.S.C. § 207.............................................................................11

47 U.S.C. § 223(d) ........................................................................11

47 U.S.C. § 230(c).................................................................1, 11, 17

## Rules

Fed. R. App. P. 40(b)(2)........................................................... 1

## Other Authorities

Amnesty International, *The Social Atrocity: Meta and the Right
    to Remedy for the Rohingya,* Index: ASA 16/5933/2022
    (Sep. 29, 2022)............................................................... 6

## RULE 40(b)(2) STATEMENT

The panel opinion in this case creates "both an intercircuit conflict and strong tension with a recent Supreme Court case." Op. at 28 (Berzon & Fletcher, JJ., concurring) (citing *Anderson v. TikTok, Inc.*, 116 F.4th 180 (3d Cir. 2024) and *Moody v. NetChoice, LLC*, 603 U.S. 707 (2024)); *see* Fed. R. App. P. 40(b)(2)(B), (C). In doing so, it raises two questions of exceptional importance involving Section 230 of the Communications Decency Act, 47 U.S.C. § 230(c)(1). *See* Fed. R. App. P. 40(b)(2)(D). Concisely stated, those questions are:

1. Does Section 230 incorporate the traditional common-law distinction between publisher liability and distributor liability?

2. Is a social media platform recommending dangerous third-party content to susceptible users acting "as the publisher" of the third-party content under Section 230?

## INTRODUCTION

Section 230 bars claims that treat an interactive computer service "as the publisher" of third-party content. 47 U.S.C. § 230(c)(1). Applying this Court's precedent, the panel held that Section 230 barred Plaintiffs' claims seeking to hold Meta liable for recommending Facebook posts inciting violence against them and others to the users most likely to act

1

on them. Yet all three judges on the panel believe the precedent to be wrong. As Judge Berzon stated in a concurrence joined by Judge Fletcher, "if not bound by Circuit precedent I would hold that the term 'publisher' under section 230 … does not include activities that promote or recommend content or connect content users to each other." Op. at 21 (Berzon & Fletcher, JJ., concurring). Similarly, in a separate concurrence, Judge Nelson stated that "[o]ur precedent has ignored the original public meaning of the term 'publisher' in Section 230's Good Samaritan provision," and "[i]n doing so, we have expanded 'publisher' to include what traditionally was never considered publishing conduct." *Id.* at 29–30 (R. Nelson, J., concurring).

As the concurrences suggest, this Court's precedent has unduly expanded Section 230 in two critical ways. First, it has read Section 230's explicit protection against publisher liability as protecting against distributor liability as well. Under the common law, publishers could be held strictly liable for transmitting unlawful content, while distributors could be held liable only when they knew or should have known that the content was unlawful. But though the statute uses only the word "publisher," and was enacted in response to a New York state court

2

decision applying publisher liability to an early online message board, this Court "ha[s] expanded Section 230 and discarded the longstanding distinction between 'publisher' liability and 'distributor' liability that existed at common law." *Id.* at 19–20 n.5 (quotations omitted). As multiple jurists have expressed, "there are good reasons to question this interpretation." *Malwarebytes, Inc. v. Enigma Software Grp. USA, LLC*, 141 S. Ct. 13, 15 (2020) (Thomas, J., writing separately); *see also Gonzalez v. Google LLC*, 2 F.4th 871, 925 n.9 (9th Cir. 2021) (Gould, J., concurring in part and dissenting in part), *vacated and remanded*, 598 U.S. 617 (2023); *Calise v. Meta Platforms, Inc.*, 103 F.4th 732, 747 (9th Cir. 2024) (R. Nelson, J., concurring); *Anderson*, 116 F.4th at 191–93 (Matey, J., concurring in part and dissenting in part); *Doe through Roe v. Snap, Inc.*, 88 F.4th 1069, 1070–72 (5th Cir. 2023) ("*Snap I*") (Elrod, Smith, Willett, Duncan, Engelhardt, Oldham, & Wilson, JJ., dissenting from denial of rehearing en banc).

Second, while Section 230 protects online platforms from liability for publishing third-party content, this Court has held that it also protects platforms from liability for their affirmative recommendation of dangerous third-party content to susceptible users. *See, e.g., Dyroff v.*

3

*Ultimate Software Grp., Inc.*, 934 F.3d 1093, 1097–98 (9th Cir. 2019); Op. at 17. But whether a platform recommending particular content or connections to its users is acting "as the publisher" of third-party content under Section 230 has also been broadly questioned. *See, e.g.*, *Gonzalez*, 2 F.4th at 913–15 (Berzon, J., concurring); *Force v. Facebook, Inc.*, 934 F.3d 53, 76–89 (2d Cir. 2019) (Katzmann, J., concurring in part and dissenting in part). The Supreme Court's recent decision in *Moody* added further fuel to that fire by suggesting that at least some recommendation algorithms should be treated as first-party content rather than the publication of third-party content. Indeed, relying on *Moody*, the Third Circuit ruled that a social media platform's recommendation of dangerous content to a child was not protected by Section 230, in direct conflict with this Court's precedent. *Anderson*, 116 F.4th at 184 & n.13 (noting conflict with *Dyroff*).

Both issues—whether Section 230 incorporates the traditional common-law distinction between publisher and distributor liability and whether recommending dangerous third-party content to susceptible users is acting "as the publisher" under the statute—are squarely presented by this case. Plaintiffs allege that Meta recommended

4

dangerous incitements to ethnic violence to those most likely to act on them, even after it had been repeatedly warned of the dangers. As this case and others demonstrate, Section 230 has the potential to shield internet companies from liability for a wide range of online conduct resulting in significant real-world harm. Given that vast potential immunity and the conflicting views of various courts and jurists on the statute's proper interpretation, this Court should accept Judge Berzon's and Judge Fletcher's "emphatic[]" request that the Court reconsider this case en banc. Op. at 28 (Berzon & Fletcher, JJ., concurring).

## STATEMENT OF THE CASE

Plaintiffs-Appellants Jane Doe 1 and Jane Doe 2 are members of the Rohingya community, a religious minority group from the Rakhine State in Burma. The Rohingya were subjected to ethnic violence and genocide, and Plaintiffs fled Burma after their villages were attacked by government forces and civilian militias. After years-long harrowing journeys, they ultimately resettled in the United States.

Plaintiffs allege that the discrimination and persecution they long faced in Burma took a notable—and violent—turn following the introduction of Facebook to Burma. Anti-Rohingya misinformation and

5

hate speech proliferated on Facebook, and the platform was used to incite violence against the Rohingya, including against Plaintiffs' villages. Specifically, Plaintiffs allege that Facebook's algorithms—designed to maximize engagement—encouraged users to create extreme and polarizing content (including incitements to violence) and promoted and amplified such content. In other words, it wasn't simply that Meta *allowed* dangerous anti-Rohingya content to flourish on Facebook, Plaintiffs allege that Meta actively encouraged the creation of violent posts and recommended those posts to the people most likely to act on them. Meta was repeatedly warned by journalists, academics, and humanitarian groups about the toxic anti-Rohingya content growing on Facebook, yet it took few—if any—measures to address those concerns. As an Amnesty International report would later conclude, "Meta's reckless business practices in [Burma] lit a match amidst a tinderbox of simmering ethnic tensions, and it ultimately substantially contributed to the litany of severe human rights abuses suffered by the Rohingya." Amnesty International, *The Social Atrocity: Meta and the Right to Remedy for the Rohingya*, at 70, Index: ASA 16/5933/2022 (Sep. 29, 2022).

6

Plaintiffs brought a five-count complaint against Meta asserting claims for strict product liability, negligent product design, negligence, aiding and abetting incitement to violence, and aiding and abetting other torts. The district court dismissed the complaint, a decision the panel affirmed on Section 230 grounds. Relying on this Court's precedent from cases like *Dyroff*, the panel held that Plaintiffs' claims were barred by Section 230:

> Following *Dyroff*'s lead, we conclude that Facebook's promotion of engagement-driven content through the 2009 recommendation algorithm must be characterized as recommending and matching conduct. We have already decided that such conduct is the work of publishers, rather than a platform's own content or messaging. Accordingly, each of Plaintiffs' claims seek to hold Meta responsible in its capacity as a publisher of the third-party content.

Op. at 17 (citations omitted). The panel decision also reiterated that this Court has interpreted Section 230 as having rejected the common-law distinction between publisher and distributor liability. *Id.* at 19–20 n.5.

Despite the unanimity of the panel decision, all three judges expressed their belief that this Court has interpreted Section 230 too broadly. *Id.* at 21 (Berzon & Fletcher, JJ., concurring) ("[T]his Court's precedent has stretched the term 'publisher' in section 230 past the

7

point of recognition[.]"); *id.* at 29 (R. Nelson, J., concurring) ("[W]e have overread Section 230, straying from the original public meaning of the statutory text and creating an all-purpose liability shield for internet platforms.").

## ARGUMENT

This Court should review the panel's decision en banc. Determining the scope of Section 230's powerful immunity is an issue of exceptional importance, and this proceeding presents a good vehicle for doing so.

**I.     Determining the limits of Section 230's powerful immunity is of exceptional importance.**

Nearly two decades ago, this Court recognized that "[t]he Internet is no longer a fragile new means of communication that could easily be smothered in the cradle by overzealous enforcement of laws and regulations applicable to brick-and-mortar businesses." *Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC*, 521 F.3d 1157, 1164 n.15 (9th Cir. 2008). To the contrary, "its vast reach into the lives of millions is exactly why we must be careful not to exceed the scope of the immunity provided by Congress." *Id.*

8

Section 230 has been interpreted by this Court and others to immunize internet companies from claims alleging their participation in advertising scams, harassment, discrimination, human trafficking, terrorism, child pornography, and—here—genocide. *See Malwarebytes*, 141 S. Ct. at 17–18 (Thomas, J., writing separately); *Calise*, 103 F.4th at 743–44. As one judge explained, "[Section] 230 rides in to rescue corporations from virtually any claim loosely related to content posted by a third party, no matter the cause of action and whatever the provider's actions." *Anderson*, 116 F.4th at 191 (Matey, J., concurring in part and dissenting in part). "The result is a § 230 that immunizes platforms from the consequences of their own conduct and permits platforms to ignore the ordinary obligation that most businesses have to take reasonable steps to prevent their services from causing devastating harm." *Id.* Before granting such powerful immunity, this Court "should be certain that is what the law demands." *Malwarebytes*, 141 S. Ct. at 18 (Thomas, J., writing separately).

## II. This Court has unduly broadened Section 230 immunity in two critical ways.

Though duty-bound to faithfully apply this Court's precedent, all three judges on the panel expressed their belief that the Court has

9

unduly broadened Section 230 immunity. This expansion has come in two principal forms.

A. **Section 230 protects defendants only from traditional publisher liability, not traditional distributor liability.**

As Judge Nelson explained in his concurrence, "[this Court's] precedent has ignored the original public meaning of the term 'publisher' in Section 230's Good Samaritan provision." Op. at 29 (R. Nelson, J., concurring). "That term should be interpreted consistent with the traditional publisher-distributor distinction developed over centuries." *Id.*

"Subsection 230(c)(1)'s key word—publisher—has a well-defined meaning at common law." *Calise*, 103 F.4th at 738-39. Traditionally, "[a] 'publisher' can bear tort liability for anything that it communicates." *Id.* "[D]istributors," on the other hand—such as bookstores or newsstands—"usually cannot be held liable for repeating unlawful content … unless they knew or had reason to know that the content was unlawful." *Id.* By using the word "publisher" in Section 230, Congress intended only to protect internet companies from traditional publisher liability, not distributor liability. *See id.* ("[W]e must presume

10

that when Congress uses 'common-law terms,' it intended to incorporate their 'well-settled meaning[s].'") (quoting *Neder v. United States*, 527 U.S. 1, 23 (1999)). Indeed, "had Congress wanted to eliminate both publisher and distributor liability [for internet companies], it could have simply created a categorical immunity in § 230(c)(1): No provider 'shall be held liable' for information provided by a third party." *Malwarebytes*, 141 S. Ct. at 16 (Thomas, J., writing separately). After all, it used that exact language in the very next subsection. *See* 47 U.S.C. § 230(c)(2) ("No provider or user of an interactive computer service shall be held liable on account of" good faith efforts to restrict obscene content).

Additionally, the Communications Decency Act elsewhere expressly authorizes liability for "knowingly … display[ing]" obscene third-party content to minors—in other words, distributor liability. 47 U.S.C. § 223(d); *id.* § 207. It strains credulity to imagine that Congress would simultaneously impose distributor liability on platforms in one context and in the same statute immunize them from that very liability.

Reading Section 230 as protecting only against publisher, not distributor, liability is further supported by the timing of the statute's enactment, nine months after the New York state court decision in

11

*Stratton Oakmont, Inc. v. Prodigy Services Co.*, No. 31063/94, 1995 WL 323710 (N.Y. Sup. Ct. May 24, 1995). In *Stratton Oakmont*, the court held that an online bulletin board was a publisher, not a distributor, of comments posted by users and could thus be held liable for third-party content. *Id.* at *3–4. It is conventional wisdom that Section 230 was passed, at least in part, to overrule *Stratton Oakmont. See Anderson*, 116 F.4th at 190 & n.16 (Matey, J., concurring in part and dissenting in part) (collecting authority). But *Stratton Oakmont* pointedly imposed only publisher, not distributor, liability on the defendant. Congress's use of the term "publisher" in the wake of *Stratton Oakmont* (coupled with the term's traditional common-law meaning) suggests that Section 230 protects internet companies only from publisher liability—that is, liability for a platform that *unknowingly* leaves up illegal third-party content.

At least one Supreme Court justice has expressed concern over reading Section 230 broadly to protect interactive computer services against distributor liability. *Malwarebytes*, 141 S. Ct. at 15–16 (Thomas, J., writing separately); *see also Doe through Roe v. Snap, Inc.*, 144 S. Ct. 2493, 2493–94 (2024) (Thomas & Gorsuch, JJ., dissenting

12

from the denial of certiorari) (citing *Malwarebytes*). Judges on this Court have too. *Calise*, 103 F.4th at 747 (R. Nelson, J., concurring) ("Our [Section 230] precedent … is inconsistent with the statutory timing—right after *Stratton Oakmont* … —and the plain statutory text, which incorporates common law terms."); *Gonzalez*, 2 F.4th at 925 n.9 (Gould, J., concurring in part and dissenting in part) ("I agree with Justice Thomas that Section 230 has mutated beyond the specific legal backdrop from which it developed."). Numerous judges on other circuit courts have as well. *Anderson*, 116 F.4th at 191–93 (Matey, J., concurring in part and dissenting in part) ("[U]nderstanding § 230(c)(1)'s use of 'publisher' to subsume distributor liability conflicts with the context surrounding § 230's enactment."); *Snap I*, 88 F.4th at 1070–72 (Elrod, Smith, Willett, Duncan, Engelhardt, Oldham, & Wilson, JJ., dissenting from denial of rehearing en banc) ("Section 230 closes off one avenue of liability by preventing courts from treating platforms as the 'publishers or speakers' of third-party content. [It] say[s] nothing about other avenues to liability such as distributor liability[.]"). Indeed, the Fifth Circuit was just one vote shy of rehearing *Snap* en banc. *Id.* at 1069.

Given the context in which Section 230 was enacted, the language it used, and the widespread concern that it is being wrongly interpreted as barring distributor liability, the Court should review this case en banc so as to ensure that it is not engaging in "the too-common practice of reading extra immunity into statutes where it does not belong." *Malwarebytes*, 141 S. Ct. at 15 (Thomas, J., writing separately).

**B.** **Recommending dangerous third-party content to susceptible users is not acting "as the publisher" of that content under Section 230.**

A second way in which this Court has unduly expanded Section 230, as Judge Berzon explained in her concurrence, is by granting immunity to platforms "for conduct that bears little resemblance to traditional activities of publication, including targeted recommendations and the affirmative promotion of interactions among users." Op. at 22 (Berzon & Fletcher, JJ., concurring). "Traditional publication has never included selecting the news, opinion pieces, or classified ads to send to each individual reader based on guesses as to their preferences and interests, or suggesting that one reader might like to exchange messages with other readers." *Gonzalez*, 2 F.4th at 914 (Berzon, J., concurring). "[S]ocial network algorithms—assessing a

14

user's prior posts, friends, or viewing habits to recommend new content and connections—are more analogous to the actions of a direct marketer, matchmaker, or recruiter than to those of a publisher." *Id.* Nevertheless, this Court has repeatedly held that recommending dangerous third-party content to susceptible users is "the work of publishers" and thus protected by Section 230. Op. at 17; *see also Dyroff*, 934 F.3d at 1097–98; *Gonzalez*, 2 F.4th at 894–97; *Doe v. Grindr Inc.*, 128 F.4th 1148, 1152–53 (9th Cir. 2025).

All three judges on the panel disagree with that precedent. Op. at 21 (Berzon & Fletcher, JJ., concurring) ("I would hold that the term 'publisher' under section 230 … does not include activities that promote or recommend content or connect users to each other."); *id.* at 33 (R. Nelson, J., concurring) ("When a plaintiff's cause of action seeks to hold a platform liable for a recommendation algorithm itself, Section 230 should provide no immunity."). That's because "algorithmic recommendations are an internet service provider's first-party speech for purposes of assessing section 230 immunity." *Id.* at 28 (Berzon & Fletcher, JJ., concurring); *see also id.* at 32 (R. Nelson, J., concurring).

15

Second Circuit Judge Katzmann offered the following hypothetical in *Force v. Facebook*:

> Suppose that you are a published author. One day, an acquaintance calls. "I've been reading over everything you've ever published," he informs you. "I've also been looking at everything you've ever said on the Internet. I've done the same for this other author. You two have very similar interests; I think you'd get along." The acquaintance then gives you the other author's contact information and photo, along with a link to all her published works. He calls back three more times over the next week with more names of writers you should get to know.

> Now, you might say your acquaintance fancies himself a matchmaker. But would you say he's acting as the *publisher* of the other author's work?

934 F.3d at 76 (Katzmann, J., concurring in part and dissenting in part). As Judge Katzmann explained, "Facebook uses the algorithms to create and communicate its own message: that it thinks you, the reader—you, specifically—will like this content." *Id.* at 82. That is Facebook's own content; it is not the publishing of third-party content. *See id.* at 76–77 ("[I]t strains the English language to say that in targeting and recommending [third-party content] to users—and thereby forging connections, developing new social networks—Facebook is acting as 'the *publisher* of … information provided by another

16

information content provider.'") (quoting 47 U.S.C. § 230(c)(1); Judge Katzmann's emphasis).

The Supreme Court's recent decision in *Moody* only strengthens the position that recommendations and matchmaking are platforms' own content, not the publishing of third-party content. In *Moody*, the Court suggested that at least some content-curating social media algorithms are "a distinctive expressive product." 603 U.S. at 731–40. But as Judge Nelson explains:

> If an algorithm is a distinctive expressive product, then it makes sense that it is a platform's own content, rather than the content of third parties. And if it is a platform's own content, rather than the content of third parties, it is not immunized by Section 230…. So it is unclear why [recommendation] algorithms should be immunized under Section 230 after *Moody*.

Op. at 32 (R. Nelson, J., concurring).

Indeed, expressly relying on *Moody*, the Third Circuit held that a social media company's "recommendations [of dangerous content to children] via its … algorithm" are not protected by Section 230. *Anderson*, 116 F.4th at 184. That holding is in direct conflict with this Court's Section 230 precedent. *See id.* at 184 n.13 ("[O]ur holding may depart from the pre-[*Moody*] views of other circuits.") (citing *Dyroff*). As

Judge Berzon noted, "*Moody v. NetChoice* and *Anderson* only underscore the necessity for *en banc* review of this Court's precedent addressing section 230." Op. at 28 (Berzon & Fletcher, JJ., concurring).

### III. This case provides a good vehicle to consider both questions.

This case provides a good vehicle for the Court to review its Section 230 precedent because it squarely presents both issues discussed above. With respect to distributor liability, Plaintiffs' complaint alleges that Meta was warned—repeatedly—that anti-Rohingya hate speech and incitements to violence were being posted on Facebook but nevertheless continued to disseminate it. ER-67–68 ¶¶ 29–31. And despite this Court's precedent rejecting the publisher/distributor distinction, Plaintiffs diligently preserved the argument. ER-54–55; Plaintiffs-Appellants' Reply Br. at 22.

With respect to content recommendation and matchmaking, Plaintiffs' complaint alleges that Meta's Facebook engagement-maximizing algorithms both encouraged the creation of toxic posts—including incitements to violence against the Rohingya—and amplified, promoted, and recommended such posts to the people most likely to act on them. ER-62 ¶ 3; ER-68–71 ¶¶ 32–44. The panel unanimously

18

concluded that these algorithms "must be characterized as recommending and matching conduct." Op. at 17. And like their distributor liability argument, Plaintiffs diligently preserved the argument that this Court's precedent regarding the recommendation of dangerous third-party content to susceptible users (such as *Dyroff*) should be overturned. ER-55; Plaintiffs-Appellants' Reply Br. at 20–21.

While agreeing that this Court should review its Section 230 precedent en banc, Judge Nelson suggests that this is not the case in which to do so. He proposes waiting for a case "where a personalized recommendation algorithm is at issue." Op. at 34 (R. Nelson, J., concurring). But as Judge Berzon correctly notes, Plaintiffs' complaint alleges that Facebook's algorithms *were* personalized—that they "recommend[ed] content based on users' previously expressed interests" and "connect[ed]" users "with similar interests." ER-70 ¶ 41; Op. at 27 (Berzon & Fletcher, JJ., concurring). Regardless, whether personalized or generic, recommendation algorithms represent a platform's own content, not the publication of third-party content. *Id.* at 26–28.[1]

---

[1]    It is worth noting that plaintiffs trying to allege the inner workings of internet companies' algorithms are at a significant disadvantage prior to discovery. Plaintiffs here were only able to bring

19

Judge Nelson also proposes waiting for a case where an algorithm makes recommendations "based on value-laden editorial choices made by the platform itself." *Id*. at 34 (R. Nelson, J., concurring). But as *Moody* makes clear, those kinds of algorithms fall within the core of First Amendment protection. *Moody*, 603 U.S. at 733–40. Section 230 may not ever need to be invoked in a case involving such algorithms because the First Amendment already protects them. In contrast, a case like this one—where the recommendation algorithms represent the platform's own content but are not necessarily protected speech—presents the Section 230 issues more cleanly. *See* Op. at 33 (R. Nelson, J., concurring) ("[W]hether algorithmic compilation and content delivery is First Amendment speech is distinct from whether it is first-party content for Section 230 purposes."); *United States v. Schiff,* 379 F.3d 621, 626 (9th Cir. 2004) (speech inciting or abetting unlawful activity is not protected by First Amendment).

Finally, Judge Nelson suggests that Plaintiffs' product liability claims are likely to fail anyway. Op. at 30–31. But even if that were

---

suit following public disclosures about Facebook's design by internal whistleblowers. ER-69 ¶ 38; ER-70 ¶ 42; ER-83–84 ¶ 91.

true, only two of Plaintiffs' five counts assert product liability claims, and Judge Nelson doesn't discuss the others. More importantly, for as long as this case has dragged on, it is still at the pleading stage, and neither the district court nor the panel addressed the merits of Plaintiffs' allegations. Maybe Plaintiffs will lose on the merits and maybe they won't. But that shouldn't stop this Court from reconsidering its Section 230 precedent en banc. "Paring back the sweeping immunity courts have read into § 230 would not necessarily render defendants liable for online misconduct. It simply would give plaintiffs a chance to raise their claims in the first place." *Malwarebytes*, 141 S. Ct. at 18 (Thomas, J., writing separately).

## CONCLUSION

The Court should grant the petition and rehear this case en banc.

Dated: May 12, 2026

Respectfully submitted,

**JANE DOE 1 and JANE DOE 2**,

By: s/ *Roger Perlstadt*
*One of Their Attorneys*

21

Ryan D. Andrews
randrews@edelson.com
Roger Perlstadt
rperlstadt@edelson.com
EDELSON PC
350 North LaSalle Street, 14th Floor
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

*Counsel for Plaintiffs-Appellants*

22

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 11. Certificate of Compliance for Petitions for Rehearing/Responses

*Instructions for this form: https://www.ca9.uscourts.gov/forms/form11instructions.pdf*

**9th Cir. Case Number(s)** 24-1672

I am the attorney or self-represented party.

I certify that pursuant to Circuit Rule 40-1, the attached petition for panel rehearing/petition for rehearing en banc/response to petition is *(select one)*:

⦿ Prepared in a format, typeface, and type style that complies with Fed. R. App. P. 32(a)(4)-(6) and **contains the following number of words:** 4,021 .
*(Petitions and responses must not exceed 4,200 words)*

**OR**

◯ In compliance with Fed. R. App. P. 32(a)(4)-(6) and does not exceed 15 pages.

**Signature** s/ Roger Perlstadt **Date** May 12, 2026
*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 11** *Rev. 12/01/24*

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| JANE DOE 1; JANE DOE 2, <br><br> *Plaintiffs - Appellants*, <br><br> v. <br><br> META PLATFORMS, INC., a Delaware corporation, <br><br> *Defendant - Appellee*. | No. 24-1672 <br><br> D.C. No. 4:22-cv-00051-YGR <br><br><br> OPINION |

Appeal from the United States District Court
for the Northern District of California
Yvonne Gonzalez Rogers, District Judge, Presiding

Argued and submitted December 4, 2024
Seattle, Washington

Filed April 28, 2026

Before: William A. Fletcher, Marsha S. Berzon, and Ryan
D. Nelson, Circuit Judges.

Opinion by Judge R. Nelson;
Concurrence by Judge Berzon;
Concurrence by Judge R. Nelson

2          DOE 1 V. META PLATFORMS

## SUMMARY*

### Communications Decency Act of 1996

The panel affirmed the district court's dismissal of plaintiffs' putative class action against Meta Platforms, Inc., alleging that anti-Rohingya content spread on Facebook incited violence against them and their villages in Myanmar and that Meta designed Facebook to encourage this bad content.

The panel held that plaintiff's claims were barred by the immunity Congress granted to online companies under Section 230 of the Communications Decency Act, which protects Meta from claims that seek to treat it as the publisher or speaker of any information provided by another information content provider.

First, the panel held that Section 230 applied to plaintiffs' claims under California's choice-of-law rules in this diversity case. Assuming California's choice-of-law rules could demand application of Myanmar's rules of decision rather than Section 230, the panel concluded that plaintiffs failed to carry their burden to show that foreign law applies. Myanmar's interest in protecting its citizens from harmful attacks and misinformation on Facebook was insufficiently incorporated into the positive law of the country, and therefore Myanmar's interest did not predominate.

---

\* This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Section 230 immunizes from liability "(1) a provider or user of an interactive computer service (2) whom a plaintiff seeks to treat, under a state law cause of action, as a publisher or speaker (3) of information provided by another information content provider." *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1100-01 (9th Cir. 2009).  At step one, the parties agreed Meta was the provider of an interactive computer service. At step two, each of plaintiffs' claims sought to hold Meta responsible in its capacity as a publisher of third-party content.  At step three, Meta did not make a "material contribution" to or develop the third-party content at issue. Accordingly, Section 230 barred plaintiffs' claims.

Concurring, Judge Berzon, joined by Judge W. Fletcher, stated that this Court's precedent has unduly expanded the scope of section 230 immunity, and has stretched the term "publisher" in section 230 past the point of recognition.  She urged this Court to reconsider en banc precedent extending section 230 immunity to recommendation of content and connections to users.

Concurring, Judge R. Nelson wrote separately to address two issues. First, this Court has over-read Section 230, straying from the original public meaning of the statutory text and creating an all-purpose liability shield for internet platforms.  Second, state choice-of-law rules can never direct application of a rule of decision contrary to federal law.  Because Section 230 is supreme to state law, it controls even if California's choice-of-law rules point to a conflicting foreign rule.

4                  DOE 1 V. META PLATFORMS

## COUNSEL

Roger J. Perlstadt (argued) and Ryan D. Andrews, Edelson PC, Chicago, Illinois, for Plaintiffs-Appellants.

Kristin A. Linsley (argued), Wesley Sze, and Rosemarie T. Ring, Gibson Dunn & Crutcher LLP, San Francisco, California; Patrick J. Fuster and Perlette M. Jura, Gibson Dunn & Crutcher LLP, Los Angeles, California; Jacob T. Spencer and Christian Dibblee, Gibson Dunn & Crutcher LLP, Washington, D.C.; for Defendant-Appellee.

## OPINION

R. NELSON, Circuit Judge:

For decades, the Rohingya have faced discrimination and violence in Myanmar. After Facebook was introduced there in 2011, anti-Rohingya content spread on the platform. Plaintiffs allege that this content incited violence against them and their villages. They argue that Meta designed Facebook to encourage this bad content and that Meta should be held responsible.

We deal from the start with the immunity Congress granted to online companies under Section 230 of the Communications Decency Act of 1996. *See* 47 U.S.C. § 230(c)(1). Section 230's grant of immunity protects Meta from claims that seek to treat it "as the publisher or speaker of any information provided by another information content provider." *Id.* We conclude that, under this court's precedents, Plaintiffs' claims treat Meta as a publisher of third-party content and are therefore barred by Section 230.

So we affirm the district court's dismissal of Plaintiffs' claims on this ground.

I

Plaintiffs are members of the Rohingya community—a largely Muslim ethnic minority population indigenous to Western Myanmar—who were displaced from their homes following attacks by military and civilian forces. The Rohingya have long been violently persecuted in Myanmar. Plaintiffs allege that the persecution has worsened in the last decade, resulting in genocide at the hands of the Burman ethnic majority and the government. This action centers on the allegation that Meta is to blame for fomenting the increased, pervasive violence against the Rohingya.

A

Plaintiffs allege that Meta, through its social media platform Facebook, played a role in the Rohingya genocide.[1] When Facebook was introduced in Myanmar in 2011, Meta partnered with telecommunications companies to pre-load Facebook onto mobile devices sold in the country, thereby allowing tens of millions of Myanmar people to access the social media platform.

Plaintiffs allege that Meta's mode of operations in Myanmar increased the risk that Facebook would be used to stoke violence in Myanmar. They assert that Facebook did not have a Burmese-language platform interface or terms and conditions. This omission meant that users could not report "misinformation, hate speech, or calls for violence." Plaintiffs also fault Meta for not actively monitoring

---

[1] As this case arises on a motion to dismiss, our factual account is based on the allegations in the amended complaint.

6                   DOE 1 V. META PLATFORMS

Facebook in Myanmar, in part because it lacked enough content moderators competent to do so.

Plaintiffs also allege that Facebook's core design and function exacerbated these harms, encouraging the creation of violent posts. Plaintiffs point to Facebook's implementation of an algorithmic content delivery system in 2009 that promoted "toxic posts" because users were more likely to interact with them. According to the complaint, people interact with toxic posts more because they play to users' negative emotions. Allegedly, to maximize user time and so the viewing of revenue-generating advertisements, Meta adjusted its algorithms to boost negative content over neutral or positive content.

Not only did this policy boost the time users spent on Facebook—it also encouraged users to post in a certain way. When users published negative or hateful posts, they saw notifications and high post engagement (such as likes and comments)—what Plaintiffs call "social rewards"—and were encouraged to post more such posts.

To illustrate the point: Imagine a user creates two posts on Facebook. The first is benign—say, a recipe for a traditional Rohingya Masser Sallon fish curry. The second contains false and inflammatory claims about Rohingya conspiracies to harm Burman Buddhists. The second post will allegedly receive more engagement—likes and shares by incensed Burman nationalists, comment wars, angry reactions, and so on. Because users have engaged with it more, the second post is boosted on other users' feeds, where it gets even more attention. And the original poster is encouraged to post more anti-Rohingya conspiracy content instead of recipes. The cycle continues, and the information system is flooded with vitriol.

Facebook's algorithm might be the same everywhere, but Plaintiffs' theory relies on the assertion that the Myanmar people are particularly susceptible to this alleged implicit encouragement of toxicity. Plaintiffs allege that the Myanmar people "lack[ed] basic understanding of how to . . . make judgments on online content" and were thus digitally unsophisticated and incapable of navigating Facebook's information environment. So susceptible were these people that they responded with real-world violence and genocide.

Plaintiffs do not allege that Facebook's 2009 algorithm boosted certain posts specifically because of the company's content preferences. Under Plaintiffs' theory, Facebook's algorithm promoted toxic content to all users to drive up engagement, reflecting the "universal human instinct[s]" for hatred and divisiveness.

B

Jane Doe 1 filed a putative class action in California state court claiming strict products liability and negligence and seeking "at least $150 billion." Meta removed the case to the Northern District of California and moved to dismiss. Meta argued that Plaintiffs' claims were untimely, barred by Section 230 of the Communications Decency Act, and failed on the merits.

The district court dismissed the complaint without prejudice, identifying general pleading deficiencies related to timeliness and the merits. Plaintiffs then filed an amended complaint, adding claims for negligent product design and aiding and abetting other torts.

Meta moved to dismiss the amended complaint on timeliness, Section 230, and merits grounds. The district

8                    DOE 1 V. META PLATFORMS

court dismissed the amended complaint with prejudice on timeliness grounds.  Plaintiffs appealed.

## II

We have jurisdiction under 28 U.S.C. § 1291.  An order granting a motion to dismiss is reviewed de novo, *Zellmer v. Meta Platforms, Inc.*, 104 F.4th 1117, 1122 (9th Cir. 2024), and we accept all plausible allegations as true, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## III

Section 230 of the Communications Decency Act commands that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider."  47 U.S.C. § 230(c)(1).  Meta argued below that Plaintiffs' claims could be dismissed under that provision. Because the district court dismissed Plaintiffs' claims as untimely, it did not reach the Section 230 issue.  But Meta renews its Section 230 arguments on appeal and asserts that the district court can be affirmed on the ground that Section 230 bars Plaintiffs' claims.  We agree.

## A

First, we consider whether Section 230 applies under California's choice-of-law rules.  Generally, federal courts sitting in diversity apply the law of the forum state— including the forum state's choice-of-law rules.  *See Cassirer v. Thyssen-Bornemisza Collection Found.*, 596 U.S. 107, 115 (2022) (discussing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)).  California, the forum state, presumptively applies its own rules of decision.  *Chen v. L.A. Truck Ctrs., LLC*, 7 Cal. 5th 862, 867 (2019).

DOE 1 V. META PLATFORMS                                9

Plaintiffs argue that the rules of decision of Myanmar apply to some questions at issue. They contend that the rules of decision of California and Myanmar conflict when it comes to immunity for interactive computer service providers. Assuming California's choice-of-law rules could demand application of Myanmar's rules of decision rather than Section 230,[2] we conclude that Plaintiffs fail to carry their burden to show that foreign law applies. *See Wash. Mut. Bank v. Superior Ct.*, 24 Cal. 4th 906, 921 (2001).

California uses the governmental interest test to determine what jurisdiction's rules of decision should apply to a given dispute. *See generally Reich v. Purcell*, 67 Cal. 2d 551 (1967). This test entails three steps: First, we determine whether the rules of decision of the potentially affected jurisdictions differ regarding the issue. *See Chen*, 7 Cal. 5th at 867–68.

Second, if the rules of decision differ, we consider the interest of each jurisdiction to decide whether a "true conflict" exists. *Id.* To do so, we determine the application

---

[2] It is "long-settled precedent" that "a federal court sitting in diversity borrows the forum State's choice-of-law rule." *Cassirer*, 596 U.S. at 115 (citing *Klaxon Co.*, 313 U.S. at 496). So, in applying California's governmental interest test, we consider whether Myanmar's interests would require application of Myanmar's rules of decision instead of Section 230. Meta notes, however, that the Supremacy Clause requires federal law to be applied as "the supreme Law of the Land," "any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." Art. VI, cl. 2. On Meta's account, there is therefore "no exception to the Supremacy Clause for state choice-of-law rules," so California's choice-of-law analysis cannot prescribe application of the Myanmar law to this case in lieu of Section 230. We do not decide whether the Supremacy Clause requires application of Section 230, without regard to a state's choice-of-law rules, as the result is the same if California's choice-of-law rules apply.

of each jurisdiction's laws "under the circumstances of the particular case." *Scott v. Ford Motor Co.*, 224 Cal. App. 4th 1492, 1503 (2014); *accord Bernhard v. Harrah's Club*, 16 Cal. 3d 313, 320 (1976), *abrogated on other grounds by statute in* Cal. Civ. Code § 1714 (2012).  And we look to the policies animating each jurisdiction's interest in having its law applied.  *See Offshore Rental Co. v. Cont'l Oil Co.*, 22 Cal. 3d 157, 163 (1978).  After all, although two jurisdictions may "have different laws, there is still no problem in choosing the applicable rule of law where only one of the [jurisdictions] has an interest in having its law applied." *Chen v. L.A. Truck Ctrs., LLC*, 42 Cal. App. 5th 488, 496 (2019) (quotation omitted).  And because it is "a serious matter" to assert a conflict between the interests of the forum and a foreign state, a foreign jurisdiction's interest "must be real rather than hypothetical." *Id.* (citation omitted).

Third, if a true conflict exists, we compare "the nature and strength of the interest of each jurisdiction" to determine "which state's interest would be more impaired" if its law were not applied.  *Id.* at 495 (quotation omitted).

Plaintiffs' choice-of-law argument fails at step two.  The United States' interest in applying Section 230 is clear.[3] Imposing liability on Meta for its actions as a publisher

---

[3] "California law includes federal law."  *Kashani v. Tsann Kuen China Enter. Co.*, 118 Cal. App. 4th 531, 543 (2004).  Section 230 is a provision of federal law and is treated as the law of California under the Supremacy Clause.  Because federal law is at issue, we consider the United States' interests in applying California's choice-of-law analysis. *See Bassidji v. Goe*, 413 F.3d 928, 933 (9th Cir. 2005) (considering the purposes underlying an applicable federal Executive Order to determine whether a contract was contrary to the public policy of California and thus whether the contract fell within a public policy exception to California choice-of-law rules).

would frustrate Section 230's purpose of "promot[ing] the continued development of the Internet and other interactive computer services." 47 U.S.C. § 230(b)(1). Plaintiffs do not dispute that.

So the question is whether Myanmar has a legitimate interest in this dispute. Plaintiffs argue that Myanmar has a significant interest in protecting people within its borders from harm. But the issue here is a question of immunity: whether American courts can treat a party as the speaker or publisher of certain third-party content. *Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1162–63 (9th Cir. 2008) (en banc). Providing immunity for actions that cause harm necessarily implicates the ability of the individuals to prevent or reduce that harm, and to seek redress for any harm suffered.

Plaintiffs rely on their foreign law expert, who states that "[t]he law on liability of internet companies in Myanmar is governed by three sources: the common law of torts, the Electronic Transactions Law of 2004[], and the Telecommunications Act of 2013." No case law supports the contention that courts in Myanmar would find tort liability for social media companies under these circumstances. Plaintiffs' expert conceded that he could find no case in Myanmar concerning a social media company. And the expert report notes that "there has been no codification of tort law in Myanmar, and indeed no statutory intervention at all in [tort] law."

Likewise, neither Myanmar statute Plaintiffs cite establishes Myanmar's interest in holding social media companies liable in tort for their actions as publishers. The Electronic Transactions Law of 2004 merely "provide[s] for validity of electronic signatures and regulate[s] the storage

of electronic data." And the Telecommunications Act of 2013 is directed at regulating "[b]lackmailing, bullying, making wrongful restraint on, defaming, disturbing, exerting undue influence on or threatening a person using a telecommunication network." Both statutes "extend[] liability to those who abet commission of an offence," but do not address the liability of social media companies as publishers. So neither statute establishes Myanmar's interest.

At bottom, Myanmar's interest in protecting its citizens from harmful attacks and misinformation on Facebook, while real, is insufficiently incorporated into the positive law of the country. Myanmar's interest therefore does not predominate. For these reasons, even if we could or should consider Myanmar law, Section 230 applies.

## B

Section 230 immunizes from liability "(1) a provider or user of an interactive computer service (2) whom a plaintiff seeks to treat, under a state law cause of action, as a publisher or speaker (3) of information provided by another information content provider." *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1100–01 (9th Cir. 2009). The parties agree that Meta was the provider of an interactive computer service. So we consider the other two steps of the *Barnes* test and conclude that, under this Circuit's case law, Section 230 immunizes Meta from Plaintiffs' claims.

## 1

The second step of the *Barnes* test asks whether a claim would treat a defendant as the speaker or publisher of third-party content. We consider whether a cause of action "seeks to plead around [Section 230's] strictures." *Est. of Bride ex*

*rel. Bride v. YOLO Techs., Inc.*, 112 F.4th 1168, 1176 (9th Cir. 2024). We have been wary of the "artful skirting" of Section 230 immunity, *Kimzey v. Yelp! Inc.*, 836 F.3d 1263, 1266 (9th Cir. 2016), and "creative attempt[s] to plead around" it, *Lemmon v. Snap, Inc.*, 995 F.3d 1085, 1094 (9th Cir. 2021). Accordingly, it is "not the name of the cause of action" that matters but "the duty that the plaintiff alleges the defendant violated," *Barnes*, 570 F.3d at 1101–02, including what the claimed duty "requir[es] the defendant to do," *Calise v. Meta Platforms, Inc.*, 103 F.4th 732, 742 (9th Cir. 2024). So if a claim turns on a defendant's status as a publisher or conduct of publishing—including "reviewing, editing, and deciding whether to publish or to withdraw from publication third-party content"—it is barred under Section 230. *Barnes*, 570 F.3d at 1102. We have also held that Section 230 bars products liability claims that "attempt to hold [a defendant] responsible for users' speech or [the] decision to publish it." *Est. of Bride*, 112 F.4th at 1180.

Plaintiffs characterize Meta's duty as one of product design—that Meta should not have built Facebook in a way that boosted incitements to violence. Still, the alleged defects relate to Facebook's core design as a publishing platform, particularly how Facebook promoted or downplayed third-party posts using algorithms. Under our case law, matching users with content is publishing conduct, even when the user has not requested the content. *See, e.g.*, *Doe v. Grindr Inc.*, 128 F.4th 1148, 1152–53 (9th Cir. 2025); *Dyroff v. Ultimate Software Grp., Inc.*, 934 F.3d 1093, 1097–98 (9th Cir. 2019); *Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119, 1124–25 (9th Cir. 2003); *see also Barnes*, 570 F.3d at 1102.

Plaintiffs identify three purported defects in Facebook's design: First, it encourages users to create "extreme and

14                    DOE 1 V. META PLATFORMS

polarizing content" by using a system of "social rewards" (such as likes, shares, and comments); second, it amplifies such content; and third, it does not allow users to report problematic posts in Burmese.

The third purported defect—suggesting that Meta did not do enough to screen and moderate content—does not eliminate the application of Section 230. It blames Meta "for not moderating content in some way, whether through deletion, change, or suppression." *Est. of Bride*, 112 F.4th at 1180; *accord Doe v. Internet Brands, Inc.*, 824 F.3d 846, 851–52 (9th Cir. 2016); *cf. Lemmon*, 995 F.3d at 1092. Section 230 immunizes interactive computer services from such claims. *See Calise*, 103 F.4th at 744. Asking a platform to monitor and review third-party content goes to Section 230's core. *See id.*[4]

---

[4] *Doe 1 v. Twitter, Inc.*, 148 F.4th 635 (9th Cir. 2025), held that "a [reporting infrastructure] claim alleging a duty that does not treat a defendant as a publisher is not barred by § 230, even if that legal duty 'might lead a company to respond with monitoring or other publication activities.'" *Id.* at 645 (quoting *HomeAway.com, Inc. v. City of Santa Monica*, 918 F.3d 676, 682 (9th Cir. 2019)). Plaintiffs alleged that, "at all relevant times, while Facebook users could post on Facebook in Burmese, Facebook's interface allowing users to report problematic posts was only in English." They also alleged that "Meta could have taken reasonable precautions to minimize the risk of harm," including "changing the design of Facebook to allow users to report problematic posts in Burmese, not just English." But Plaintiffs mentioned the alleged English-language reporting issues only once in their opening brief. Plaintiffs did not discuss the effect of Section 230 on their reporting infrastructure theory in their reply brief. Plaintiffs have forfeited any argument about their reporting infrastructure theory "by failing to address it in [their] reply brief even though [Meta] raised [Section 230] in its answering brief." *Maciel v. Cate*, 731 F.3d 928, 932 n.4 (9th Cir. 2013).

DOE 1 V. META PLATFORMS                    15

The first and second alleged defects warrant more discussion. These theories fold together: After all, posts are algorithmically boosted because users engage with them, and users engage with them because they are boosted. In other words, Facebook's promotion of posts is inextricably (even circularly) linked to the "social rewards" reflecting third-party engagement. Plaintiffs' claims based on these alleged defects are barred by Section 230 if algorithms that provide users with suggestions of some third-party posts over others constitute publishing conduct. Under our precedent, they do.

These theories of harm depend on the content of third-party posts. *Est. of Bride*, 112 F.4th at 1180. The complaint is filled with allegations that "Facebook posts caused a wave of violence," and that these "posts, pages, and groups . . . were effective for inciting and organizing" the violence at issue. The encouragement provided by social rewards ultimately depends on third-party engagement and content.

This dynamic is true even though Plaintiffs try to frame the issue as a matter of product design. To be sure, we have held that a products liability claim against a web platform can survive Section 230. *See Lemmon*, 995 F.3d at 1092. But this case is unlike *Lemmon*. And those differences point toward publisher status protected by Section 230. *Lemmon* was about users' direct interaction with Snapchat's platform features (a speed filter). *Id.* That interaction (speeding) was not mediated by third-party content, meaning the claim stood independently of the content that other users created. *Id.* at 1087, 1093–94.

This case, on the other hand, is about the content of third-party posts. *Cf. id.* at 1093–94. Plaintiffs' theory is about

16                DOE 1 V. META PLATFORMS

the sharing of messages and what happens when some users interact with bad content, allegedly because of how the Facebook algorithm promoted some content whether specifically requested or not. *Cf. Est. of Bride*, 112 F.4th at 1180; *accord Grindr Inc.*, 128 F.4th at 1152–53. It thus necessarily relies on information provided by third parties. *See Lemmon*, 995 F.3d at 1087, 1093–94; *accord Barnes*, 570 F.3d at 1101. Calling Facebook a "product" rather than a publication platform only obscures the point that Meta "published user-generated speech that was harmful" to Plaintiffs. *Kimzey*, 836 F.3d at 1266. This case is more like *Estate of Bride*, where we concluded that a products liability claim was barred by Section 230: "What is th[e] harm" at the root of Plaintiffs' claims but the violent and inciting "posts of others" posted on Facebook? 112 F.4th at 1180.

Relying on *Moody v. NetChoice, LLC*, 603 U.S. 707 (2024), Plaintiffs also suggest that Facebook's algorithm was itself Meta's message or content. If that were true, then we might not have to treat Meta as the publisher or speaker of third-party content, and Section 230 might be avoided. *See Barnes*, 570 F.3d at 1100–01. But our case law has taken another tack on whether algorithm design represents platforms' own content.

In *Dyroff*, we held that algorithmic content delivery and "recommending" content is "meant to facilitate the communication and content of others" and is thus a form of publisher conduct, not a message or content itself. 934 F.3d at 1097–98. That was true even though the Experience Project—the platform at issue in *Dyroff*—used "machine-learning algorithms" to recommend content to users "based on the content of their posts and other attributes." *Id.* at 1095. Facebook's 2009 algorithm is alleged to be much less tailored. *See supra* pp. 6–7.

DOE 1 V. META PLATFORMS                17

Following *Dyroff*'s lead, we conclude that Facebook's promotion of engagement-driven content through the 2009 recommendation algorithm must be characterized as recommending and matching conduct. We have already decided that such conduct is the work of publishers, rather than a platform's own content or messaging. *See Dyroff*, 934 F.3d at 1095; *accord Est. of Bride*, 112 F.4th at 1181. Accordingly, each of Plaintiffs' claims seek to hold Meta responsible in its capacity as a publisher of the third-party content. *See Lemmon*, 995 F.3d at 1093; *accord Est. of Bride*, 112 F.4th at 1180.

2

Under the third step of the *Barnes* test, we consider whether Meta made a "material contribution" to or developed the third-party content at issue. *Rigsby v. GoDaddy Inc.*, 59 F.4th 998, 1008 (9th Cir. 2023) (quoting *Gonzalez v. Google LLC*, 2 F.4th 871, 892 (9th Cir. 2021)). On this front, *Roommates.com* emphasized that a platform's provision of "neutral tools" for users to publish content is not material contribution to such content. 521 F.3d at 1171–72. This is especially true where the content is posted contrary to the website's "express policies" and depends on users' "voluntary inputs." *Id.*

Meta provided users "something along the lines of blank text boxes in which they could post" content of all stripes on Facebook. *Dyroff*, 934 F.3d at 1099; *accord Roommates.com*, 521 F.3d at 1173. This blank-box system "could be utilized for proper or improper purposes." *Roommates.com*, 521 F.3d at 1172. Facebook did not "provide any specific guidance as to what" users' posts should contain, "nor [did] it urge [users] to input" violent or genocidal content. *Id.* at 1173–74. And Facebook did not

18                     DOE 1 V. META PLATFORMS

"require[] users to post specific content" to access its services. *Dyroff*, 934 F.3d at 1099; *accord Roommates.com*, 521 F.3d at 1166.

Plaintiffs' theory of social rewards does not amount to an allegation that Facebook "made suggestions regarding the content of potential user posts," either. *Dyroff*, 934 F.3d at 1099. The system of social rewards that Plaintiffs complain of is, "on [its] face, neutral." *Calise*, 103 F.4th at 745. There is no plausible allegation in the complaint that the Facebook algorithm specifically treated anti-Rohingya content differently than any other third-party content. *See Gonzalez*, 2 F.4th at 894–95. What's more, nothing in the complaint plausibly alleges that Meta singled out or selected violence-prone users to post violent content. *Cf. Huon v. Denton*, 841 F.3d 733, 742 (7th Cir. 2016).

Nor can there be any doubt that third-party users willingly provided "the essential published content" underlying Plaintiffs' claims, *see Carafano*, 339 F.3d at 1124, and that such "information was tendered to [Facebook] for publication online," *Roommates.com*, 521 F.3d at 1174. So, under our case law, this is "precisely the kind of situation for which [S]ection 230 was designed to provide immunity." *Id.*

We have also stated that a defendant's actions must relate to "what makes the displayed content illegal or actionable." *Kimzey*, 836 F.3d at 1269 n.4 (quotation omitted); *accord Dyroff*, 934 F.3d at 1099. Even if the Facebook algorithm and system of third-party feedback and "social rewards" encouraged the posting of content, nothing about the platform's design contributed to what made those posts illegal or actionable. *See Kimzey*, 836 F.3d at 1269 n.4; *accord Roommates.com*, 521 F.3d at 1172. "Meta's

'solicitation' and 'assistance' efforts" were "allegedly used for unlawful purposes, but that does not result from Meta's efforts." *Calise*, 103 F.4th at 745; *accord Kimzey*, 836 F.3d at 1269 n.4. And, unlike *Lemmon*, the alleged "social rewards" that Plaintiffs argue motivated offending behavior or content resulted from user engagement. *Cf.* 995 F.3d at 1091–92.

At this step, too, the algorithm does not change our calculus or count as a material contribution. *See Dyroff*, 934 F.3d at 1099. Facebook algorithmically boosted content that users engaged with more. But in this way, Facebook's 2009 algorithm is like the algorithmic "matching" we have determined does not affect coverage by Section 230. *See Carafano*, 339 F.3d at 1123–25.

If a personalized algorithm that used machine learning to pick up on users' preferences and attributes was not a material contribution in *Dyroff*, then neither is the more rudimentary algorithm here. *See supra* p. 7; *cf. Dyroff*, 934 F.3d at 1095; *Gonzalez*, 2 F.4th at 894–95. Facebook's 2009 algorithm "helped facilitate . . . user-to-user communication," but did not materially contribute to or develop the content of the communications itself. *See Dyroff*, 934 F.3d at 1099.

Accordingly, each of Plaintiffs' claims fail the third step of our *Barnes* test. Under our precedent, Facebook's algorithm did not materially contribute to the allegedly unlawful posts here—nor did it contribute to the alleged unlawfulness of that content itself.[5]

---

[5] Plaintiffs also argue that Meta was the "distributor," not the "publisher," of the third-party posts. This is a distinction without a difference. We have expanded Section 230 and "discarded the

20 DOE 1 V. META PLATFORMS

IV

Meta created Facebook, an interactive computer service. That service recommended content to users to maximize engagement. Under our precedent, that is publishing conduct that does not materially contribute to or develop the underlying content.

Plaintiffs believe that Facebook's design, coupled with the darker elements of human nature, caused real-world harm. But Section 230, as we have interpreted it, bars their claims, and we cannot hold Meta "responsible for the unfortunate realities of human nature." *Est. of Bride*, 112 F.4th at 1181.

**AFFIRMED.**

---

BERZON, Circuit Judge, with whom W. FLETCHER, Circuit Judge, joins, concurring:

I concur in the majority opinion in full. We are bound by Ninth Circuit precedent addressing the scope of section 230 immunity, which requires the conclusion we reach here: The plaintiffs claims' challenging Facebook's algorithmic design seek to treat Meta "as the publisher or speaker of any information provided by another information content provider," 47 U.S. § 230(c)(1), so section 230 provides Meta

---

longstanding distinction between 'publisher' liability and 'distributor' liability" that existed at common law. *Calise*, 103 F.4th at 747 (R. Nelson, J., concurring) (quoting *Malwarebytes, Inc. v. Enigma Software Grp. USA, LLC*, 141 S. Ct. 13, 15 (2020) (statement of Thomas, J., respecting the denial of certiorari)).

with immunity. *See Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1100–01 (9th Cir. 2009).

I nevertheless continue to think that this Court's precedent has unduly expanded the scope of section 230 immunity. For the reasons persuasively outlined by Judge Katzmann in his partial dissent in *Force v. Facebook*, 934 F.3d 53 (2d Cir. 2019), *cert. denied*, 140 S. Ct. 2761 (2020), and as I stated in my concurrence in *Gonzalez v. Google LLC*, 2 F.4th 871 (9th Cir. 2021), *vacated*, 598 U.S. 617 (2023), "if not bound by Circuit precedent I would hold that the term 'publisher' under section 230 reaches only traditional activities of publication and distribution—such as deciding whether to publish, withdraw, or alter content—and does not include activities that promote or recommend content or connect content users to each other," *Gonzalez*, 2 F.4th at 913 (Berzon, J., concurring).

The Supreme Court declined to address the application of section 230 to the claims presented in *Gonzalez v. Google*. *See* 598 U.S. at 622. But the Court later held in *Moody v. NetChoice, LLC*, 603 U.S. 707 (2024), that an online platform's decisions about how to order, organize, or display third-party content are the platform's "expressive choices." *Id.* at 740. Some courts have taken *Moody* as an invitation to reconsider the scope of section 230 immunity—rightfully so. *See infra* p. 25. Our case law has nevertheless continued to reinforce a reading of the term "publisher" in section 230 that reaches far outside the scope of traditional publication. Although I agree with several of the points raised by Judge R. Nelson in his concurrence, I write separately to underscore how this Court's precedent has stretched the term "publisher" in section 230 past the point of recognition, and to address whether *Moody* may offer another path forward.

22 DOE 1 V. META PLATFORMS

A.

We held in *Barnes* held that "publication involves reviewing, editing, and deciding whether to publish or to withdraw from publication third-party content." 570 F.3d at 1102. I do not disagree with *Barnes* on this point. "A website's decisions to moderate content, restrict users, or allow third parties full freedom to post content and interact with each other all therefore fall squarely within the actions of a publisher shielded from liability under section 230." *Gonzalez*, 2 F.4th at 914 (Berzon, J., concurring).

As I explained in my concurrence to *Gonzalez v. Google*, however, the line of cases after *Barnes* took an astonishingly expansive view of what "publication involves." *Barnes*, 570 F.3d at 1102. For example, *Dryoff v. Ultimate Software Grp., Inc.*, 934 F.3d 1093 (9th Cir. 2019), held that, "[b]y recommending user groups and sending email notifications, [the website defendant] was acting as a publisher of others' content. These functions—recommendations and notifications—are tools meant to facilitate the communication and content of others. They are not content in and of themselves." 934 F.3d at 1098. Since *Gonzalez v. Google*, this Court has continued to grant section 230 immunity to internet service providers for conduct that bears little resemblance to traditional activities of publication, including targeted recommendations and the affirmative promotion of interactions among users.

Consider *Calise v. Meta Platforms, Inc.*, 103 F.4th 732 (9th Cir. 2024). *Calise* involved claims brought by Facebook users who alleged that they were harmed by fraudulent third-party advertisements posted to the website. 103 F.4th at 736. The *Calise* plaintiffs claimed that scammers exploited Meta's targeted advertising practices to "deliberately target

Meta's more vulnerable users." *Id.* The plaintiffs alleged that, as a predicate step to promoting advertisements to users, Meta solicited advertisement sales from disreputable advertisers, even where Meta knew the advertisers violated Meta's policies. *Id.* at 737.

*Calise* held that Meta's asserted duty to vet third-party advertisements implicated "quintessential publishing conduct." *Id.* at 744. It was not enough, *Calise* reasoned, that the plaintiffs pointed to Meta's manipulation of third-party advertisements "to skew fraudulent content (because it could make more money) by targeting certain advertisers." *Id.* 746. Instead, *Calise* concluded, the solicitation and selection of certain advertisers did not "materially contribute" to the unlawfulness of the advertisements and so was protected by section 230. *Id.*; *see also Dryoff*, 934 F.3d at 1099; *Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC*, 521 F.3d 1157, 1168 (9th Cir. 2008) (en banc) ("[A] website helps to develop unlawful content, and thus falls within the exception to section 230, if it contributes materially to the alleged illegality of the conduct.").

It did not matter that the advertisements in *Calise* were commercial activity. Meta sold the advertising space, and so essentially acted as a salesperson or marketer. But under this Court's precedent, *Calise* concluded Meta's sales activities are captured by the term "publisher." [1]

Again relying on *Dryoff*, this Court in *Doe v. Grindr Inc.*, 128 F.4th 1148 (9th Cir. 2025), *cert. denied*, 146 S. Ct. 319 (2025), squarely addressed recommendations of third-party

---

[1] As he does here, Judge R. Nelson acknowledged his concerns regarding the Ninth Circuit's interpretation of section 230 in a concurrence to *Calise. See generally Calise*, 103 F.4th at 746–48 (R. Nelson, J., concurring).

24                    DOE 1 V. META PLATFORMS

content by an internet service provider to its users. *Grindr* involved claims brought by John Doe, a minor, against a dating app. 128 F.4th at 1152. "[Grindr] matches users based on proximity, and it allows matched users to send direct messages to each other." *Id.* Doe alleged that the app's matching function—that is, its recommendation of users to other geographically proximate users—was defective, and that Grindr was negligent for breaching its duty to avoid matching him with adult men who would abuse him. *Id.*

*Grindr* concluded that the app's matching function is "meant to facilitate the communication and content of others" and is therefore "content neutral" on its own. *Id.* at 1153 (quoting *Dryoff*, 934 F.3d at 1098, 1100). And *Grindr* held that Doe's state law claims "necessarily implicate[d] Grindr's role as a publisher of third-party content." *Id.* That is because, *Grindr* reasoned, any alleged duty to "suppress matches and communications between adults and children" would "require Grindr to monitor third-party content," and to thereby act as a publisher. *Id.*

*Grindr*'s conclusion that section 230 barred Doe's claims because they challenged the app's recommendation function is consistent with *Dryoff*. Yet I struggle to see how "facilitat[ing] the communication and content" of app users on the basis of geographical proximity has any relationship to traditional publishing activities. *Id.* (quoting *Dryoff*, 934 F.3d at 1098). Nevertheless, the Ninth Circuit has plainly "extend[ed] immunity under section 230 to targeted recommendations of content and connections." *Gonzalez*, 2 F.4th at 917 (Berzon, J., concurring).

Whether soliciting scam advertisements or matching adults with minors on dating apps, this Court's broad reading of section 230 of the Communications Decency Act permits

internet service providers affirmatively to behave indecently, potentially—as alleged in *Dryoff* and *Grindr*—causing serious harm to vulnerable people. In my view, the conduct challenged in these cases stretches far beyond the traditional activities of publication contemplated by section 230.

## B.

Another approach is possible. Outside the Ninth Circuit, other courts have—as Judge R. Nelson notes in his concurrence, R. Nelson Concurrence at 33—taken first steps to narrow section 230's broad sweep.

Most notably, *Anderson v. TikTok, Inc.*, 116 F.4th 180 (3d Cir. 2024), held that a social media company's algorithm was the company's "own expressive activity," and so section 230 did not bar the plaintiff's claims. 116 F.4th at 184. To do so, *Anderson* relied on the Supreme Court's recent First Amendment decision in *Moody v. NetChoice*, which addressed a challenge to Florida and Texas laws limiting the ways in which social media platforms can censor, suppress, or otherwise moderate certain user-generated content. 603 U.S. at 720–21.

To address whether the state laws implicated the First Amendment, *Moody* observed that "the First Amendment offers protection when an entity engaging in expressive activity, including compiling and curating others' speech, is directed to accommodate messages it would prefer to exclude." *Id.* at 731. Even if "achieved through the use of algorithms," *id.* at 734, *Moody* concluded, "[w]hen the platforms use their Standards and Guidelines to decide which third-party content [their] feeds will display, or how the display will be ordered and organized, they are making expressive choices," *id.* at 740.

26 DOE 1 V. META PLATFORMS

Drawing from *Moody*, *Anderson* reasoned that, if algorithmic recommendations are first-party speech under the First Amendment, those recommendations are first-party speech under section 230. *Anderson*, 116 F.4th at 184. I agree.

At issue in *Anderson* was the recommendation algorithm used by the TikTok social media platform. *Id.* at 182. TikTok "curates and recommends a tailored compilation of videos" for each user based on "a variety of factors," including the user's demographics and past online interactions. *Id.* The TikTok algorithm recommended to a ten-year-old child "Blackout Challenge" videos, "which encourage[] viewers to record themselves engaging in acts of self-asphyxiation." *Id.* at 181. Attempting the "Blackout Challenge," the child unintentionally hanged herself, and her mother brought suit. *Id.* Emphasizing that section 230 immunizes "only information 'provided by another,'" *id.* at 184, (quoting 47 U.S.C. § 230(c)(1)), and because the plaintiff sought to hold TikTok liable for its *own* information—that is, TikTok's algorithm, its "expressive product" under *Moody*— *Anderson* held that section 230 did not bar the plaintiff's claims.

I believe *Anderson* was correct to interpret TikTok's algorithm as the platform's first-party speech, and "to chart a new course in response to *Moody*." R. Nelson Concurrence at 33. This Court should follow suit.

C.

I agree with Judge R. Nelson's concurrence to the extent that he contends Ninth Circuit precedent has expanded the definition of "publisher" "to include what traditionally was never considered publishing conduct." *Id.* at 30. But I disagree with his suggestion that "advanced [that is,

individualized] algorithms are more clearly outside the scope of traditional third-party publishing conduct that Section 230 protects" than algorithms which make recommendations based on generic characteristics of content. [2] *Id.* at 34.

In my view, generic, content-based algorithms do not bear any more resemblance to traditional publication than their "advanced"—individualized—counterparts. Even where, as in the case of Meta's activities in Myanmar, an algorithm allegedly promoted third-party content partly on the basis of cumulative user engagement, the assessment of user viewing habits to recommend content remains "more analogous to the actions of a direct marketer, matchmaker, or recruiter than to those of a publisher." *Gonzalez*, 2 F.4th at 914 (Berzon, J., concurring). Such recommendations carry an inherent message that is attributable to the internet service provider making the recommendation. Whether generated by an "advanced," "personalized recommendation" algorithm, R. Nelson Concurrence at 34, an "engagement-maximizing" algorithm, *id.*, or by hand, I understand suggestions and recommendations to be distinct messages presented by social media companies. Those messages

---

[2] I note that the plaintiffs' allegations suggest Facebook's algorithm made both "engagement-maximizing" and personalized recommendations. True, the complaint describes the composition of Facebook's News Feed ("the first thing that users see when opening the app or entering the site") as follows: "Posts with higher engagement scores are included and prioritized in the News Feed, while posts with lower scores are buried or excluded altogether." But the complaint also alleges that Facebook's algorithms "recommend[ed] content based on users' previously expressed interests" and "connect[ed]" users "with similar interests." So I disagree with Judge R. Nelson to the extent he maintains the algorithm in this case "was not tailored to users." R. Nelson Concurrence at 35.

28                    DOE 1 V. META PLATFORMS

cannot be attributed to any third parties and so are not protected by section 230.

*     *     *

If not bound by Circuit precedent, I would hold that section 230 does not bar the claims raised against Meta in this case because "websites' use of machine-generated algorithms to recommend content and contacts are not within the publishing role immunized under section 230." *Gonzalez*, 2 F.4th at 917 (Berzon, J., concurring). Both *Moody v. NetChoice* and the *Anderson* case cast this Court's unfettered expansion of section 230 into even more doubt than at the time of *Gonzalez v. Google*. Taken together, *Moody* and *Anderson* persuasively suggest that algorithmic recommendations are an internet service provider's first-party speech for purposes of assessing section 230 immunity. And those two cases demonstrate that there is now both an intercircuit conflict and strong tension with a recent Supreme Court case. *Moody v. NetChoice* and *Anderson* only underscore the necessity for *en banc* review of this Court's precedent addressing section 230. I again—even more emphatically on this go round—urge this Court to reconsider *en banc* our precedent extending section 230 immunity to recommendation of content and connections to users.

DOE 1 V. META PLATFORMS                    29

R. NELSON, Circuit Judge, concurring:

Under our precedent, Section 230 bars Plaintiffs' claims. I write separately to address two issues. First, we have over-read Section 230, straying from the original public meaning of the statutory text and creating an all-purpose liability shield for internet platforms. Second, state choice-of-law rules can never direct application of a rule of decision contrary to federal law. Because Section 230 is supreme to state law, it controls even if California's choice-of-law rules point to a conflicting foreign rule.

I

First, Section 230. There is, of course, a "growing chorus of voices calling for a more limited reading of the scope of section 230 immunity." *Gonzalez v. Google LLC*, 2 F.4th 871, 913 (9th Cir. 2021) (Berzon, J., concurring), *vacated*, 598 U.S. 617 (2023). I agree with that sentiment, but perhaps for different reasons. *See Calise v. Meta Platforms, Inc.*, 103 F.4th 732, 746–48 (9th Cir. 2024) (R. Nelson, J., concurring).

Our precedent has ignored the original public meaning of the term "publisher" in Section 230's Good Samaritan provision. *See* 47 U.S.C. § 230(c)(1). That term should be interpreted consistent with the traditional publisher-distributor distinction developed over centuries regarding certain speech torts. *See Malwarebytes, Inc. v. Enigma Software Grp. USA, LLC*, 141 S. Ct. 13 (2020) (Thomas, J., statement respecting denial of certiorari); *Anderson v. TikTok, Inc.*, 116 F.4th 180, 187–91 (3d Cir. 2024) (Matey, J., concurring in part and dissenting in part); *see also Free Speech Coal., Inc. v. Paxton*, 606 U.S. 461, 476 n.4 (2025). Although Section 230 immunizes platforms from liability as "publishers" of third-party content, we bar claims even

30                    DOE 1 V. META PLATFORMS

tangentially related to online speech.  *See, e.g.*, *Est. of Bride v. YOLO Techs., Inc.*, 112 F.4th 1168, 1182 (9th Cir. 2024).  In doing so, we have expanded "publisher" to include what traditionally was never considered publishing conduct.

For example, as the opinion explains, Plaintiffs' product liability claims are barred by Section 230 under our precedent.  *See* Maj. 13–16.  But how does a product liability claim hinge on treating the provider of an interactive computer service as the publisher of third-party content? *See Malwarebytes*, 141 S. Ct. at 17 (Thomas, J., statement respecting denial of certiorari).

Sure, we might *analogize* a party's duty (for example, in designing products) to that of a publisher.  But if the claim does not *actually* require us to treat a defendant as the publisher of third-party content, Section 230's plain text is inapt.  Even if a product liability claim might look like publishing third-party content from afar, the duty underlying such a claim is not "*identical* to publishing or speaking." *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1107 (9th Cir. 2009) (emphasis added).     Some   torts—like   negligent undertaking—could be functional duplicates of publishing-based speech torts.  *See id.*  But the connection here seems too attenuated.

None of this is to say that Plaintiffs' product liability claims hold any water.  Just the opposite—they likely fail under California law.  *Not* because they remind us of another sort of claim that would demand we treat the provider of an interactive computer service as the publisher of third-party content.  But because substantive product liability law likely stops them cold.  After all, I am skeptical that Facebook (like other   social   media   platforms)   is   a   "product."     *See* Restatement  (Third)  of  Torts:  Products  liability  § 19(a)

(1998) ("A product is *tangible personal property* distributed commercially for use or consumption." (emphasis added)); *accord Pierson v. Sharp Mem'l Hosp., Inc.*, 216 Cal. App. 3d 340, 345 (1989). Plaintiffs' claims therefore likely fail on the merits, and we need not stretch Section 230 to reject them.

I also agree that we have strayed in immunizing algorithms. *See Gonzalez*, 2 F.4th at 913–18 (Berzon, J., concurring). We have taken a strong position that algorithms are almost always third-party publishing activity, and rarely a platform's own content. *E.g.*, *Dyroff v. Ultimate Software Grp., Inc.*, 934 F.3d 1093, 1098 (9th Cir. 2019).

But Section 230's protection of third-party publishing conduct should reach only "traditional" activities of publication and distribution—not every modern activity that bears some remote resemblance to it. *See Gonzalez*, 2 F.4th at 913 (Berzon, J., concurring); *Force v. Facebook, Inc.*, 934 F.3d 53, 81 (2d Cir. 2019) (Katzmann, J., concurring in part and dissenting in part). This is, after all, what publishing meant when Section 230 was enacted. *See Gonzalez*, 2 F.4th at 914–15. And such a definition better adheres to the history and tradition of common-law protection for publishers that Section 230 codified. *See Malwarebytes*, 141 S. Ct. at 15 (Thomas, J., statement respecting the denial of certiorari).

Modern recommendation algorithms are opaque, esoteric, and—particularly when artificial intelligence enters the fray—incomprehensible, sometimes even to their own designers. *See Moody v. NetChoice, LLC*, 603 U.S. 707, 795–96 (2024) (Alito, J., concurring in the judgment). Much of the matchmaking and network creation that modern algorithms engage in does not fit within any fair definition

32          DOE 1 V. META PLATFORMS

of publishing conduct.  *See Force*, 934 F.3d at 76–77, 82–83, 85 (Katzmann, J., concurring in part and dissenting in part).

And even if algorithms are publishing conduct, the Supreme Court has suggested that they are the publishing of the platforms' *own* content.  *See Moody*, 603 U.S. at 707, 731, 734.  *Moody* compares the algorithmic compilation of third-party speech to newspapers and other traditional publishing activity.  *See id.* at 732–33, 738.  "An entity 'exercis[ing] editorial discretion in the selection and presentation' of content is 'engage[d] in speech activity.'" *Id.* at 731 (quoting *Ark. Ed. Television Comm'n v. Forbes*, 523 U.S. 666, 674 (1998)).  "[T]hat is as true when the content comes from third parties as when it does not."  *Id.* And it is also true when the prioritization of content is "achieved through the use of algorithms" that provide "individualized . . . recommendations."  *Id.* at 734.

As the Supreme Court said, personalized recommendation algorithms constitute a platforms' own "distinctive expressive product."  *Id.* at 731.  If an algorithm is a distinctive expressive product, then it makes sense that it is a platform's own content, rather than the content of third parties.  And if it is a platform's own content, rather than the content of third parties, it is not immunized by Section 230. *See Barnes*, 570 F.3d at 1101 ("By its terms, then, section (c)(1) only ensures that in certain cases an internet service provider will not be 'treated' as the 'publisher or speaker' *of third-party content* . . . ." (emphasis added)); *Force*, 934 F.3d at 80–81 (Katzmann, J., concurring in part and dissenting in part); *see also Doe ex rel. Roe v. Snap, Inc.*, 88 F.4th 1069, 1071 (5th Cir. 2023) (Elrod, J., dissenting from denial of rehearing en banc).  So it is unclear why algorithms should be immunized under Section 230 after *Moody*.

True, whether algorithmic compilation and content delivery is First Amendment speech is distinct from whether it is first-party content for Section 230 purposes. We have never squared that circle, and neither has the Supreme Court. *Cf. NetChoice, LLC v. Paxton*, 142 S. Ct. 1715, 1717 & n.2 (2022) (Alito, J., dissenting from grant of application to vacate stay). And what counts as algorithmic speech is not yet fully developed, either.[1] As Justice Barrett explained, the majority did not resolve whether purely engagement-maximizing algorithms were expressive. *See Moody*, 603 U.S. at 746–47 (Barrett, J., concurring).

At any rate, *Moody*'s thrust is clear: Personalized recommendation algorithms can constitute a platform's own message, even if third-party content is in the mix. Accordingly, even if non-traditional publishing conduct (such as the use of recommendation algorithms) is publishing activity, the result is the same: Section 230 does not apply. When a plaintiff's cause of action seeks to hold a platform liable for a recommendation algorithm itself, Section 230 should provide no immunity.

Some courts have already begun to chart a new course in response to *Moody*, deciding that recommendation algorithms are platforms' own content and declining to apply Section 230. *See Anderson*, 116 F.4th at 184. We have already tied ourselves to the mast, however, and while *Moody* cast some doubt on our precedent about recommendation algorithms, our precedent has not been effectively overruled. *See Miller v. Gammie*, 335 F.3d 889, 893 (9th Cir. 2003). So it will fall to the en banc court to

---

[1] The Court seems to be gesturing at a broad vision of algorithmic speech: if an algorithm affects how information is published, it counts as platform speech.

34 DOE 1 V. META PLATFORMS

"plumb the depths" of Section 230 immunity once again, especially when it comes to algorithmic content delivery.[2] *Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1161 (9th Cir. 2008) (en banc).

But this is not the case to correct our precedent. The chief problem with our Section 230 precedent—particularly *Dyroff*—involves personalized algorithms custom-fit to individual users based on their engagement habits and content preferences. *See* 934 F.3d at 1095. Such advanced algorithms are more clearly outside the scope of traditional third-party publishing conduct that Section 230 protects. *See Gonzalez*, 2 F.4th at 914 (Berzon, J., concurring). And it was that kind of advanced, personalized algorithm that *Moody* considered. *See* 603 U.S. at 734–35. So we should revisit our doctrine where a personalized recommendation algorithm is at issue.

We might also await a vehicle in which a platform manipulates its algorithmic content delivery to boost or de-boost content based *not* on what users are likely to engage with, but based on value-laden editorial choices made by the platform itself. Such a case would avoid Justice Barrett's doubts about whether engagement-maximizing algorithms are a message of their own. *See Moody*, 603 U.S. at 746 (Barrett, J., concurring). And it should not take long for such a case to arise. Major internet platforms appear all too happy

---

[2] The Supreme Court has avoided Section 230. *See, e.g.*, *Gonzalez*, 598 U.S. at 622. In the meantime, since three-judge panels cannot do much to make things better, we should labor not to make them worse. *See Kennedy v. Bremerton Sch. Dist.*, 4 F.4th 910, 945 (9th Cir. 2021) (R. Nelson, J., concurring) (we should not extend incorrect and ahistorical precedent).

to engage in this kind of direct interference of information. *See, e.g.*, *Murthy v. Missouri*, 603 U.S. 43, 50–53, 62–68 (2024); *id.* at 81–91 (Alito, J., dissenting); *Moody*, 603 U.S. at 719, 742; *Children's Health Def. v. Meta Platforms, Inc.*, 112 F.4th 742, 751–53 (9th Cir. 2024).

Some algorithms are both personalized and more clearly present a platform's own ideological message. TikTok, for example, uses a highly advanced personalized recommendation algorithm that responds not only to a user's engagement with content but also other online actions and user metadata. *See Anderson*, 116 F.4th at 181–82. And its algorithm was developed and maintained by a foreign adversary with a particular message to send to Americans. *Cf. TikTok Inc. v. Garland*, 604 U.S. 56, 78–79 (2025). There is strong evidence that this algorithm is an anti-American propaganda tool to push some political narratives while suppressing others. *E.g.*, David Leonhardt, *TikTok's Pro-China Tilt*, N.Y. Times (Apr. 24, 2025).[3]

The algorithm here, however, was based on the more primitive technology available in 2009. *See* Maj. 7. The 2009 algorithm was not tailored to users. Nor is it alleged to learn from individual users' engagement habits. And it did not push or hide narratives based on the specific content shared by users. Like the analysis of algorithmic speech in the First Amendment context, these facts matter. *See Moody*, 603 U.S. at 747 (Barrett, J., concurring); *see also id.* at 749 (Jackson, J., concurring in part and in the judgment); *id.* at 769 (Alito, J., concurring in the judgment). More modern algorithms would be a better vehicle than the antediluvian, decade-old algorithm here. *See Force*, 934

---

[3] *Available at* https://perma.cc/9CLA-TJPQ.

36                    DOE 1 V. META PLATFORMS

F.3d at 58 (discussing Facebook's more recent personalized recommendation algorithm).

## II

The opinion discusses California's choice-of-law analysis before determining whether to apply Section 230. *See* Maj. 8–12. We did not need to do so. After all, Section 230 is a matter of federal law. And California law cannot contradict federal law—either directly or indirectly.

Start with first principles. By constitutional design, state governments have many advantages over the federal government, including broader legislative authority. *See* The Federalist Nos. 45, 46 (James Madison). But the Constitution gives the federal government some legislative advantages. Article I expressly delegates certain powers to the federal government. And where legislation is validly enacted pursuant a delegated power, federal law is supreme to the law of the states, "any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const., art. VI, cl. 2. "[A]ny Thing" necessarily includes state choice-of-law rules. *Id.*

The Supremacy Clause was controversial during the ratification debates, but its necessity to our constitutional design of delegated powers is obvious. *See* The Federalist No. 33 (Alexander Hamilton). Without it, federal legislative power "would have been reduced to the same impotent condition" that the Constitution sought to remedy, The Federalist No. 44, at 222 (James Madison) (Jim Miller ed., 2014), and "would amount to nothing," The Federalist No. 33, at 151 (Alexander Hamilton) (Jim Miller ed., 2014). Federal supremacy is the "necessary and unavoidable implication" of delegating enumerated powers to the federal government. *Id.* at 149–50.

DOE 1 V. META PLATFORMS                    37

Accordingly, if federal law reflects the lawmaking power properly delegated to Congress, it definitionally cannot be repugnant to states' authority. *See* The Federalist No. 45 (James Madison); *see also* The Federalist No. 32 (Alexander Hamilton). Just the opposite: without giving due effect to the Supremacy Clause, the Constitution would create a government "founded on an inversion of the fundamental principles of all government"—a "monster" of disorganized and unworkable governance. The Federalist No. 44, at 222 (James Madison) (Jim Miller ed., 2014).

Plaintiffs' proposed rule of decision and federal law lead to clashing results. *See Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 325 (2015). So the Supremacy Clause "instructs courts what to do" and commands application of federal law. *Id.*; *accord DelCostello v. Int'l Bhd. Teamsters*, 462 U.S. 151, 159 n.13 (1983).

Myanmar's rules of decision would apply here only by operation of California law. *Beech Aircraft Corp. v. Superior Ct.*, 61 Cal. App. 3d 501, 522 (1976). And the Supremacy Clause preempts California from choosing any rule of decision contrary to federal law. This would impermissibly "give effect to state laws that conflict with federal laws." *Armstrong*, 575 U.S. at 324.

If California cannot directly override federal law (e.g., through legislation stating that providers of certain interactive computer services can be treated as publishers or speakers of third-party content), *cf. Williams v. Reed*, 604 U.S. 168, 182 (2025) (Thomas, J., dissenting), it cannot do so indirectly (e.g., by adopting a choice-of-law test that would adopt a foreign jurisdiction's rule of decision that would do the same thing). Indeed, we have already said that when general choice-of-law doctrine might lead to a decision

38                    DOE 1 V. META PLATFORMS

that would conflict with federal law, "general 'choice-of-law doctrines . . . have no applicability.'" *Murphy v. DirecTV, Inc.*, 724 F.3d 1218, 1228 (9th Cir. 2013) (quoting *Roadway Package Sys., Inc. v. Kayser*, 257 F.3d 287, 293–94 (3d. Cir. 2001), *abrogated on other grounds by Hall St. Assocs. v. Mattel, Inc.*, 552 U.S. 576 (2008)). As we explained, "the relevant rule is supplied by the Constitution itself: a valid federal law preempts any state law purporting to regulate the same issue." *Id.* (quotation and quotation marks omitted).

Our past decision in *Bassidji v. Goe* supports this conclusion. 413 F.3d 928 (9th Cir. 2005). *Bassidji* assumed that federal law (the International Emergency Economic Powers Act by operation of an Executive Order) must apply "through the Supremacy Clause." *Id.* at 933. The California choice-of-law analysis was consulted, but not a workaround to federal law. Instead, the choice-of-law question was relevant to the "separate question" of the *enforceability* of admittedly illegal contracts under substantive contract law. *Id.* at 936. In other words, *Bassidji* assumed that federal law applied, rendering the contracts-at-suit illegal. The question that remained was the implication of that illegality. Here, no such "separate question" needs to be answered by resort to any choice-of-law analysis.[4] *Id.*

At bottom, we reached the correct result: Section 230 applies, despite Plaintiffs' choice-of-law arguments. But

---

[4] Plaintiffs also argue that Section 230 is relevant only to "State or local law[s]," pointing to 47 U.S.C. § 230(e)(3). But Section 230(e)(3) is inapt. Section 230(c)(1) operates independently and has not been read to be constrained by (e)(3) as Plaintiffs suggest. More importantly, Myanmar's rules of decision would apply only by operation of "State . . . law." So applying an inconsistent rule of decision by mirroring foreign law would still be the sort of application of inconsistent State law that (e)(3) forbids.

California's choice-of-law rules need not be consulted in the first place. After all, the relevant rule of decision "is supplied by the Constitution itself" by operation of the Supremacy Clause. *Murphy*, 724 F.3d at 1228 (quotation omitted).

Allowing states' choice-of-law rules to backdoor the Supremacy Clause would "provide a roadmap for States wishing to circumvent" federal law. *See Haywood v. Drown*, 556 U.S. 729, 742 n.9 (2009). That would make federal lawmaking power a nullity, *see* The Federalist No. 44 (James Madison), and would allow state governments to "sap the foundations of the Union" and upset the basic design of our constitutional republic, The Federalist No. 33, at 150 (Alexander Hamilton) (Jim Miller ed., 2014). Simply put, there is no choice-of-law exception to the Supremacy Clause. *Cf.* 28 U.S.C. § 1652.